J.W., K.W., L.J., T.S., L.S., F.S., P.G., and Else Blount, Plaintiffs-Appellees,

v.

CITY OF TACOMA, WASHINGTON; Mike Parker, Mayor of the City of Tacoma: Tim Strege, Barbara Bischel, John Hawkins, Douglas Sutherland, Jack Hyde, Steve Kirby, Hal Nielsen and Peter Rasmussen, Members of the Tacoma City Council; Erling Mork, City Manager of the City of Tacoma; Robert Hamilton, City Attorney of the City of Tacoma; Ben Thompson, Chief, Building Division of the City of Tacoma; in their official capacities and their officers, agents, employees and successors, Defendants-Appellants.

No. 82–3199.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 7, 1983.

Decided Nov. 25, 1983.

Lonnie Davis, Tacoma, Wash., for plaintiffs-appellees.

Kyle Crews, Tacoma, Wash., for defendants-appellants.

Before BROWNING, Chief Judge, and FLETCHER and PREGERSON, Circuit Judges.

FLETCHER, Circuit Judge:

The City of Tacoma appeals from a declaratory judgment concerning the city's refusal to issue a special use permit authorizing persons formerly institutionalized for mental health treatment to be included in a group home located in a residential district. The district court held that the denial of the permit was arbitrary and violated the due process clause of the 14th amendment. We affirm.

## I

## BACKGROUND

Else Blount, appellee in this action, operates a group home in the City of Tacoma, Washington. No more than eight residents live in the home at any given time. Among Blount's residents are former patients in mental institutions. For purposes of its zoning ordinance, Tacoma defines Blount's home as a "Group Care Home Class II," because it is a "state approved dwelling for persons leaving mental institutions." Tacoma, Wash., Code § 13.06.010(34.1) (1983). Blount's home is located in a district of the city designated "R–2" residential by the city zoning ordinance. Under the ordinance, a Group Care Home Class II may be operated in an R–2 district with a special use permit. *Id.* § 13.06.375(B)(m) (1982). An identical group home that did not include newly-released mental patients would be classed as a "Group Care Home Class I" and could be operated without a permit.

Soon after she began operating the residence as a Group Care Home Class II, Blount was informed that she was required to obtain a special use permit. She promptly applied. Following a hearing, and acting partly on the basis of an adverse recommendation by the Tacoma Department of Planning, a municipal Hearings Examiner denied the permit. Blount appealed the decision to the Tacoma City Council, which affirmed the denial of the permit by a 5–2 vote.

Blount then commenced this action in federal court. She challenged the ordinance both on its face, as unlawful discrimi-

nation against persons who have suffered from mental illness, and as applied. The district court, without reaching the facial challenge to the ordinance, ruled that the permit scheme had been applied to Blount's home in an arbitrary and unconstitutional manner. The court granted Blount's request for a declaration to that effect, and also entered a permanent injunction against application of the ordinance to Blount. The form of this relief has not been challenged on appeal.[1]

The City of Tacoma now appeals from the district court ruling in Blount's favor.

## II

## DISCUSSION

 Generally, a municipal zoning ordinance will not be held unconstitutional if its wisdom is at least fairly debatable and it bears a rational relationship to a permissible state objective. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 4, 8, 94 S.Ct. 1536, 1538, 1540, 39 L.Ed.2d 797 (1974); *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926). Constitutional scrutiny of zoning regulations is heightened, however, when the regulations infringe a fundamental interest, *see, e.g., Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981); *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (opinion of Powell, J.); *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1347 (9th Cir.1982), or discriminate against a suspect class, *see, e.g., Buchanan v. Warley,* 245 U.S. 60, 74, 82, 38 S.Ct. 16, 18, 20, 62 L.Ed. 149 (1917); *Kennedy Park Homes, Inc. v. City of Lackawanna,* 436 F.2d 108, 114 (2d Cir.1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). The question here presented is whether an ordinance that imposes special disabilities upon residences for former mental patients must receive heightened review.

The Supreme Court has recently restated the basis for determining whether a given legislative action must be subjected to more than ordinary rationality review:

> The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. Thus we have treated as presumptively invidious those classifications that disadvantage a "suspect class," or that impinge upon the exercise of a "fundamental right." With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest. In addition, we have recognized that certain forms of legislative classification, while not facially invidious, nonetheless give rise to recurring constitutional difficulties; in these limited circumstances we have sought the assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State.

*Plyler v. Doe,* 457 U.S. 202, 216–18, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982) (footnotes omitted). The *Plyler* opinion applied heightened scrutiny to legislation in the third category. The legislative classification at issue in *Plyler* affected a group that was *not* a suspect class and did not impinge on the exercise of a fundamental right. Because, however, the affected group possessed some of the characteristics of a suspect class, and the benefit denied to the group was, if not fundamental, important, the Court concluded that heightened scrutiny was appropriate.

In explaining the constitutional difficulties that presumptively accompany legislation impinging on suspect classes, the court noted:

> Some classifications are more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective. Legislation predicated on such prejudice is easily recognized as incompatible with the

---

1. Our disposition therefore implies no approval of the form of relief granted below.

constitutional understanding that each person is to be judged individually and is entitled to equal justice under the law. 457 U.S. at 216 n. 14, 102 S.Ct. at 2394 n. 14. The *Plyler* formulation is consistent with the approach in other cases in which the decision whether to apply intensified scrutiny turned upon whether the group singled out by statute had been subjected to unique disabilities on the basis of stereotyped characteristics not truly corresponding to the attributes of its members. *Compare Mississippi University for Women v. Hogan,* 458 U.S. 718, 723–32, 102 S.Ct. 3331, 3336–40, 73 L.Ed.2d 1090 (1982) (statute establishing single-sex nursing school invalid because based on "stereotyped view of nursing as an exclusively women's job") *with Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (statute requiring police officers to retire at 50 valid because "persons over 50" had not been categorized on the basis of stereotyped characteristics). As *Plyler* itself makes clear, heightened scrutiny may be appropriate for legislative classifications that do not affect a "suspect class" but, nonetheless, raise constitutional problems of the same variety as those the Court treats as "presumptively invidious." See 457 U.S. at 216, 218 & n. 16, 102 S.Ct. at 2394, 2395 & n. 16.

In the present case, it is highly "likely" that the Tacoma ordinance distinguishes group homes that include former mental patients from other group homes on the basis of prejudices concerning persons who have been institutionalized for mental health treatment. The prevalence of such notions is amply demonstrated by the frequency of suits challenging zoning decisions relating to halfway houses for mental patients. *See generally* Annot., 100 A.L.R.3d 876 (1980). *See also* Hearings on Constitutional Rights of the Mentally Ill Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 91st Cong., 1st & 2d Sess. 62–63 (1969–1970) (many people have an irrational fear of the mentally ill) *cited in Civil Commitment of the Mentally Ill,* 87 Harv.L.Rev. 1190, 1200 (1974); *cf. Parham v. J.R.,* 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) (recognizing that commitment for mental illness can result in unwarranted social stigma). But the city has produced no evidence to support a blanket assertion that former mental patients as a class are particularly dangerous, disruptive, or otherwise undesirable neighbors.[2] We note also that the benefits the ordinance restricts are the former mental patients' access to housing and rehabilitative services. While they are not fundamental rights, they, like education at issue in *Plyler,* are essential to individuals' full participation in society. Indeed, for former mental patients, a reintegration into society accomplished through living in a moderately structured setting in residential neighborhoods is an essential part of therapy.[3]

◼ We conclude that the Tacoma ordinance may well result from "archaic and stereotypic notions," and must therefore receive special judicial attention. *See Mississippi University for Women v. Hogan,* 102 S.Ct. at 3336.

◼ At the same time, however, we assume for the purposes of our analysis that "former mental patients" are not a full-

---

2. Other groups of persons burdened by the Tacoma ordinance, such as parolees, may be situated significantly differently. Although the record before us in this case does not address the issue, it is conceivable that community fears concerning such groups may rest on a sound factual basis. *But see Nicholson v. Connecticut Half-Way House, Inc.,* 153 Conn. 507, 218 A.2d 383, 385–86 (1976) (halfway house for parolees would not be enjoined as nuisance where fears of community residents, although genuinely felt, rested completely on supposition). Each group must, of course, be considered in light of its own peculiar circumstances.

3. *Cf. Youngberg v. Romeo,* 457 U.S. 307, 319, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982) (constitutional right to minimally adequate or reasonable habilitation). Congress has recognized the rights of the developmentally disabled, and expressed an official preference for treatment "in a setting that is least restrictive of the person's personal liberty." 42 U.S.C. § 6010(2) (1976).

fledged suspect class for purposes of constitutional analysis.[4] We make this assumption because the basis for treating these persons separately at this time seems not *completely* divorced from relevant factual considerations. We assume that community residents with a history of mental illness *may* sometimes present special problems best addressed by special legislative measures. In short, "former mental patient" status, like the "illegal alien" status of the plaintiffs considered in *Plyler v. Doe,* is not a "constitutional irrelevancy." *See* 457 U.S. at 223, 102 S.Ct. at 2398. We are guided by *Plyler* to conclude that the discrimination against former mental patients embodied in the Tacoma zoning ordinance is valid if rational, but that it is rational only if it furthers some substantial goal of the municipality. *Id.* at 224, 102 S.Ct. at 2398; *see also id.* at 235 n. 3, 102 S.Ct. at 2404 n. 3 (Blackmun, J., concurring).

The Tacoma ordinance plainly "discriminates" against former mental patients in the sense that it singles them out for special treatment solely because of their medical history. A group home housing former mental patients may be operated only with a special use permit, even though another group home similar in all respects but not housing former mental patients would not require a permit. The record discloses that Blount herself operated her group home for many years without a permit before deciding to take on former mental patients.

■ The ordinance sets forth highly specific criteria for determining whether a special use permit should be granted.[5] These criteria focus quite properly upon traditional zoning concerns, including "the health, safety, convenience or general welfare of persons residing or working in the community." These goals are certainly legitimate and substantial objects of the police power. *See Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974). The use permit scheme is a rational method of ensuring that group homes with former mental patients do not, because of the special characteristics of their residents, interfere with these interests. On its face, the ordinance is constitutional.

■ Although a zoning classification or permit scheme is facially valid, however, it may not be applied in an unconstitutional fashion. *Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 121–23, 49 S.Ct. 50, 51–52, 73 L.Ed. 210 (1928); *Nectow v. City of Cambridge,* 277 U.S. 183, 187, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928). Normally, the denial of a permit will be upheld unless arbitrary. *See Nasser v. City of Homewood,* 671 F.2d 432, 441 (11th Cir. 1982). The scope of federal court review of zoning decisions generally is extremely narrow. *See id.* But here constitutional con-

---

**4.** We do not foreclose the possibility that, in a case with a record more fully developed as to the characteristics and status of former mental patients, a conclusion that they indeed constitute a suspect class might be warranted.

**5.** The municipal Hearings Examiner is empowered to issue a permit if the following conditions are satisfied:

1. There shall be a demonstrated need for the special use within the community at large which shall not be contrary to the public interest.

2. The special use shall be consistent with the goals and policies of the Land Use Management Plan and applicable ordinances of the City of Tacoma.

3. The Hearings Examiner shall find that the special use shall be located, planned and developed in such a manner that the special use is not inconsistent with the health, safety, convenience or general welfare of persons residing or working in the community. The Examiner's findings shall be concerned with, but not be limited to, the following:

 a. The generation of noise, noxious or offensive emissions, or other nuisances which may be injurious or to the detriment of a significant portion of the community.

 b. Availability of public services which may be necessary or desirable for the support of the special use. These may include, but shall not be limited to, availability of utilities, transportation systems, and education, police and fire facilities, and social and health services.

 c. The adequacy of landscaping, screening, yard setbacks, open spaces or other development characteristics necessary to mitigate the impact of the special use upon neighboring properties.

Tacoma, Wash., Code § 13.06.375(C) (1983).

cerns are heightened, because the individual permit application decision may rest upon inaccurate and stereotypic fears about the group singled out for special treatment by the legislative classification. In this situation, a court must look more carefully to determine whether the decision to deny a permit is related to the substantial state interest that justifies the discriminatory classification. Unless it specifically serves such an interest, the permit denial is arbitrary and violates due process.[6]

■ The city's decision to deny Blount the requested permit fails to withstand such analysis. The ordinance prerequisites for issuance of a permit are conceded by the city to be satisfied. The State of Washington has officially concluded that there is a special need for more small, family-like group homes for the mentally ill in residential neighborhoods. It was stipulated below that the Blount house,

> both by its external and internal physical characteristics, has the appearance of a single family dwelling. It is a split-level ranch-style house, and its exterior appearance is both similar to and compatible with the surrounding neighborhood. It was originally a single family dwelling and was converted to a group home by adding some bedrooms. The physical alterations necessary for this conversion were done by Mrs. Blount's ex-husband and are in full compliance with the building code of the City of Tacoma.

The city further admits that "[t]he existence of the home does not create any parking problems within the neighborhood, nor has it led to any undue burden on existing utilities, transportation systems, education, police or fire facilities."

Our review of the record indicates that the municipal Hearings Examiner denied the permit, despite satisfaction of the ordinance criteria, principally because of the heavy opposition of neighbors at the public

hearing on Blount's application. The Examiner found that testimony at the hearing established four incidents of objectionable behavior by residents of Blount's home. Once, police were summoned by Blount because one of her residents, not a former mental patient, was drinking and driving at an excessive rate of speed in the neighborhood. On another occasion, a neighbor saw what she believed to be a rifle pointed from the home, although Blount denied that any of her residents possessed a gun. The other two incidents cited were "a man relieving himself in public" and "a naked individual in public view." The Examiner stated that the individuals involved could not be identified as former mental patients. However, based on these incidents, the Examiner concluded that "the proposed Special Use has not been operated in such a manner as to preclude activity which would constitute a nuisance to the surrounding neighborhood."

■ The zoning ordinance states that a permit should be denied if the proposed use would "generate noise, noxious or offensive emissions or other nuisances which may be injurious to or to the detriment of a significant portion of the community." This portion of the ordinance serves substantial zoning interests. But the Examiner's reasons for denying the Blount permit do not fairly reflect those interests. Nothing found by the Examiner indicates that inclusion of former mental patients in the Blount home would be "injurious to or to the detriment of a significant portion of the community." The undisputed record shows that none of the former patients had a history of violent or criminal behavior. Nor did the Examiner find any other reason to believe that they might be dangerous, or that their presence in the Blount home would work any significant injury, inconvenience, or annoyance to the community, the district or any person. We therefore agree with the district court that denial of the permit was arbitrary, because the decision to deny was

6. In a different context, the Fifth Circuit has invalidated the denial of a permit where the decision implicated free speech concerns, and was made "in reliance on public distaste for certain activities, instead of on legislative determinations concerning public health and safety." *Bayou Landing, Ltd. v. Watts,* 563 F.2d 1172, 1175 (5th Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1979).

not related to any substantial zoning interest.[7] *See Washington ex rel. Seattle Trust Co. v. Roberge,* 278 U.S. 116, 122, 49 S.Ct. 50, 52, 73 L.Ed. 210 (1928), *quoted in Village of Belle Terre v. Boraas,* 416 U.S. 1, 6–7, 94 S.Ct. 1536, 1539–1540, 39 L.Ed.2d 797 (1974).

█ Significantly, the City of Tacoma has never attempted to justify the decision to deny the permit in terms of the ordinance criteria. Instead, it rests its argument that denial was not arbitrary exclusively upon the fact that the city provided Blount with an extensive procedural mechanism for challenging the decision, including a hearing and an appeal to the city council. But the city has cited no authority for the proposition that a decision arbitrary when made can be validated by a procedurally correct review process that produces an equally arbitrary ruling. The city council gave no additional reasons when it affirmed the permit denial. Council review cannot, therefore, validate the decision, because at some point, the action of local officials must be justified by reference to some "adequate determining principle" or "consideration and regard for facts or circumstances." *See Chapman v. Public Utility District No. 1,* 367 F.2d 163, 168 (9th Cir.1966) (quoting *United States v. Carmack,* 329 U.S. 230, 243, 67 S.Ct. 252, 258, 91 L.Ed. 209 (1946)).

The judgment is AFFIRMED.

---

**7.** It is true, as Washington courts have noted, that proximity to a group home for former mental patients may diminish neighboring property values. *See Park v. Stolzheise,* 24 Wash.2d 781, 793–94, 167 P.2d 412, 418 (1946). We do not consider this factor, standing alone, to constitute a substantial interest justifying exclusion of former mental patients. In the absence of other factual reasons, it must be presumed that any diminution stems from popular prejudices based on inaccurate stereotypes. Property value diminution stemming from such prejudice against a class of persons has been held insufficient to justify a zoning restriction. *E.g., Buchanan v. Warley,* 245 U.S. 60, 82, 38 S.Ct. 16, 20, 62 L.Ed. 149 (1917).

Other decisions sustaining zoning decisions to prohibit group homes for former mental patients are distinguishable because the proposed uses in those cases were incompatible with the surrounding neighborhood for reasons unrelated to the histories of dwellers. *See, e.g., City of Guntersville v. Shull,* 355 So.2d 361, 362–63 (Ala.1978) (prohibited use amounted to a "rooming" or "boarding" house, in violation of municipal ordinance); *Chestnut Hill Co. v. City of Snohomish,* 76 Wash.2d 741, 743, 747–48, 458 P.2d 891, 893, 896 (1969) (rezoned use was a large nursing home located in a district undergoing long-term residential development), *cert. denied,* 397 U.S. 988, 90 S.Ct. 1119, 25 L.Ed.2d 396 (1970). In the present case, by contrast, there is no question that the Blount home was compatible with the surrounding neighborhood in every way except, arguably, for the medical histories of its residents.