CLEBURNE LIVING CENTER, INC., et al., Plaintiffs-Appellants,

v.

CITY OF CLEBURNE, TEXAS, et al., Defendants-Appellees.

No. 82–1565.

United States Court of Appeals, Fifth Circuit.

March 5, 1984.

**192**

Renea Hicks, Advocacy, Inc., Austin, Tex., for plaintiffs-appellants.

Earl Luna, Dallas, Tex., for defendants-appellees.

Before CHARLES CLARK, Chief Judge, GOLDBERG and POLITZ, Circuit Judges.

GOLDBERG, Circuit Judge:

The segregation of one group from the rest of society has been the historical bench- mark of unfair discrimination in this coun- try. Such segregation perpetuates false stereotypes about the exiled group and leads to a virtual caste system built on misconceptions. Thus, blacks were unable to disprove racist stereotypes so long as they were excluded from white neighbor- hoods and their children were isolated in segregated schools.

Moreover, the effects of such segregation are especially pernicious when the outcast group lacks the political power to resist unfair categorization. Courts have careful- ly scrutinized legislation that discriminates against politically impotent groups, for un- der those circumstances the danger is great that the statute will reflect and enshrine untrue stereotypes.

In the present case, we are faced with the isolation of just such a group—the mentally retarded, i.e. persons who possess certain learning disorders[1] but who are to be dis- tinguished from the "mentally ill."[2] A zon- ing ordinance of Cleburne, Texas, excludes mental retardates' group homes from the permitted uses in the "apartment house dis- trict." The owners of a proposed group home challenged the ordinance under the Federal Revenue Sharing Act and the

[1]. As an expert, Dr. Phillip Roos, stated at trial:

A: Essentially mental retardation is a problem of learning. It is manifested partic- ularly in difficulty with abstract thinking, judgment and problem solving and includes social adjustment and economic productivity.

Q: How do you decide if a person is men- tally retarded?

A: We use basically three criteria: Meas- ured intelligence, adaptive behavior and medical classification.

Q: Are there different degrees or levels of mental retardation?

A: Very definitely. There is a wide varia- bility among retarded individuals. The mild- est level of mental retardation, referred to as mild mental retardation, these are individuals whose intelligence is roughly between an IQ of 50 and an IQ of 70. This includes approxi- mately eighty-nine percent of all mentally retarded people. Roughly nine out of ten mentally retarded people are mildly retarded.

Moderate mental retardation, IQ's of roughly 35 to 50, include six percent of the population. Severe mental retardation, IQ's 20 to 35, profound mental retardation, IQ below 20, these two categories combined in- clude only about five percent of the popula- tion.

Trial Transcript at 137–38, 140.

[2]. Dr. Roos also explained that mental retarda- tion is not a mental illness.

Q: Is mental retardation a type of mental illness?

A: No, sir. It's an entirely different con- dition requiring entirely different approaches.

Q: Well, how do they differ?

A: Mental retardation is a problem of a deficit in intellectual development and social adaption. Its onset is sometimes from birth or during childhood. It is primarily an edu- cational type of problem. And, traditionally it is irreversible. By which I mean there may be some amelioration, but to date it is not a curable condition.

Mental illness, on the other hand, is a dis- order of thinking, of emotions and of behav- ior. It can occur anytime in life, often after a period of normal development. It is primari- ly a psychiatric, rather than an educational problem, and often it is reversible. That is, it is potentially curable in many cases.

Trial Transcript at 138–139.

Equal Protection Clause of the Fourteenth Amendment. We reject the Revenue Sharing Act claim, because zoning was not a "program or activity" receiving federal funds. In evaluating the Equal Protection claim, we hold that mental retardates constitute a "quasi-suspect" class; and, therefore, we test the ordinance according to the "intermediate" level of scrutiny established by the Supreme Court. Because the city has failed to prove that the ordinance substantially furthers a significant governmental interest, we hold that the ordinance violates the Equal Protection Clause.

## I. FACTS

In July, 1980, Jan Hannah purchased a house at 201 Featherston Street in Cleburne, Texas. Hannah is the Vice President and part-owner of Cleburne Living Centers, Inc. ("CLC"), a Texas corporation organized for the purpose of establishing and operating supervised group homes for the mentally retarded. Hannah bought the Featherston house for the purpose of leasing it to CLC for the operation of a group home, classified as a Level I Intermediate Care Facility.

The home would house thirteen men and women who are mildly or moderately retarded. They would receive twenty-four hour supervision from CLC staff members, working eight-hour shifts. In addition to handling some cooking and cleaning, the staff would work with the mentally retarded residents to train them in such skills as "kitchen management, maintenance, personal budgeting, meat preparation, academics related to independent living (such as how to read classified advertisements for jobs and housing), and the use and enjoyment of leisure time activities."[3] An interdisciplinary team of staff workers would prepare an individualized program for each resident, based on his or her particular needs. The residents would have jobs in the community and in a work activity center. They would probably not have private

cars. Their stay at the home would be voluntary, and the length of the stay indeterminate.

As a Level I Intermediate Care Facility, the Featherston home would be subject to extensive regulations and guidelines established and administered by the United States Department of Health and Human Resources, the Texas Department of Human Resources, the Texas Department of Mental Health and Mental Retardation, and the Texas Department of Health. CLC plans to comply with all applicable and valid statutes, regulations, codes, and ordinances. *Cleburne, supra* note 3, at 6, Finding 20.

For mentally retarded persons living in the 1980's, the existence of group homes is critical to assimilation into the normal culture. As the trial court found,

> Group homes currently are the principal community living alternatives for persons who are mentally retarded. The availability of such a home in communities is an essential ingredient of normal living patterns for persons who are mentally retarded, and each factor that makes such group homes harder to establish operates to exclude persons who are mentally retarded from the community.

*Cleburne Living Center v. City of Cleburne, supra* note 3, at 9, Finding 30. At present, there are no group homes or hospitals for the mentally retarded in Cleburne. One is located in Keene, Texas, approximately 15 minutes by automobile from Cleburne.

## II. THE ORDINANCE

Section 8 of Cleburne's zoning ordinance lists the permitted uses in a district zoned R–3:

1. Any use permitted in District R–2.
2. Apartment houses, or multiple dwellings.
3. Boarding and lodging houses.
4. Fraternity or sorority houses and dormitories.
5. Apartment hotels.

---

**3.** *Cleburne Living Center v. City of Cleburne,* No. CA 3–80–1576–F, slip op. at 7, Finding 23

(N.D.Tex. April 16, 1982).

6. *Hospitals,* sanitariums, nursing homes *or homes for* convalescents or aged, *other than for the* insane or *feeble-minded* or alcoholics or drug addicts.

7. Private clubs or fraternal orders, except those whose chief activity is carried on as a business.

8. Philanthropic or eleemosynary institutions, other than penal institutions.

9. Accessory uses customarily incident to any of the above uses. . . .

*Id.* at 4, Finding 12 (emphasis added).

Section 16, subdivision 9, of the same ordinance requires that special use permits be obtained for *"hospitals for the* insane or *feeble-minded,* or alcoholic or drug addicts, or penal or correctional institutions" that are to be operated anywhere in the city. *Id.* at 5, Finding 13 (emphasis added). Because the Featherston house is located in an R–3 zone and, more generally, because it is located anywhere within Cleburne, its use as a group home is not automatically permitted but requires a special use permit from the Cleburne City Council. Under the zoning ordinance, each special use permit is valid for only one year; so the owners of the Featherston house would have to reapply year after year.

III. PROCEEDINGS BELOW

On July 28, 1980, Hannah applied for a special use permit. The Cleburne Planning and Zoning Commission held a hearing and denied the permit. On October 14, 1980, the City Council of Cleburne held a public hearing on the permit application and again voted (3–1) to deny the permit. The Council members considered the following factors:

1. the attitude of a majority of owners of property located within two hundred (200) feet of 201 Featherston;

2. the location of a junior high school across the street from 201 Featherston;

3. concern for the fears of elderly residents of the neighborhood;

4. the size of the home and the number of people to be housed;

5. concern over the legal responsibility of CLC for any actions which the mentally retarded residents might take;

6. the home's location on a five hundred (500) year flood plain; and

7. in general, the presentation made before the City Council.

After exhausting administrative remedies, Hannah and the CLC sued for injunctive relief and damages, in the United States District Court for the Northern District of Texas. They were joined by the plaintiffs Johnson County Association for Retarded Citizens (JCARC) and Advocacy, Inc. in asserting the constitutional rights of mentally retarded persons who were potential residents of the facility. JCARC is an organization that aims to improve the welfare and treatment of the mentally retarded. Advocacy, Inc. is a non-profit corporation that provides legal services to developmentally disabled persons.

The defendants in the suit include the City of Cleburne and individual city employees and council members. After a bench trial, the district judge entered judgment denying the plaintiffs relief on each of the grounds they had claimed. This appeal follows.

IV. ISSUES ON APPEAL

The plaintiffs raise various challenges to the zoning ordinance on its face and as applied. They argue, first, that the ordinance and the special use permit denial violate the Revenue Sharing Act which prohibits discrimination against "otherwise qualified" handicapped people. 31 U.S.C. § 1242(a)(1) (1982), *recodified at* 31 U.S. C.A. § 6716(b)(2) (1983).

The plaintiffs also claim that the ordinance and its application violate the Equal Protection and Due Process clauses of the Constitution.[4] We find the Revenue Shar-

4. The plaintiffs assert that the ordinance violates Due Process in two ways. The distinctions drawn in the statute are allegedly arbi-

trary and capricious, thus failing to meet the minimal rationality requirements set out in *Village of Euclid v. Ambler Realty Co.,* 272 U.S.

ing Act claim unconvincing in the circumstances of this case. However, we hold that the Cleburne ordinance, both on its face and as applied, denies equal protection. Therefore, we need not address the other constitutional claims. The one tangential issue that is worthy of note is the defendants' argument that JCARC lacks standing to prosecute this suit. Given the specific facts of this case, we agree. That determination does not affect our decision on the merits, however, for the other plaintiffs remain in the suit.

## V. REVENUE SHARING ACT

■ The plaintiffs argue, first, that the zoning function of the Cleburne City Council is within a "program or activity" subject to the provisions of the Revenue Sharing Act. 31 U.S.C.A. § 6716 (1983). We disagree. As the trial court held, clear and convincing evidence proved that federal funds were not used to finance the zoning activities of the City Council. *See* 31 U.S.C.A. § 6716(c)(1); *see also North Haven Board of Education v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 1926, 72 L.Ed.2d 299 (1982) ("program or activity" language in Education Amendments of 1972 makes their coverage program-specific); *Brown v. Sibley,* 650 F.2d 760, 767 (5th Cir.1981) (receipt of federal financial assistance by multiprogram entity, for application to certain programs or activities, does not bring entire entity within the reach of Section 504 of the Rehabilitation Act); *Board of Public Instruction of Taylor County v. Finch,* 414 F.2d 1068 (5th Cir.1969) (multiple programs in Title VI context).

The plaintiffs claim, however, that the City Council itself is an activity receiving federal funds, because it decides which specific city programs will ultimately receive the monies. Therefore, every action of the City Council (including zoning) is subject to the requirements of the Revenue Sharing Act. *Cf. Grove City College v. Bell,* 687 F.2d 684 (3d Cir.1982), *cert. granted* —— U.S. ——, 103 S.Ct. 1181, 75 L.Ed.2d 429 (1983) (entire college a "program or activity" in Title IX case). We are not willing to make that leap in the circumstances of the case. Even if we assume that the City Council's function in disbursing funds subjected those decisions to the Revenue Sharing Act, there was no apparent link between that function and the Council's function in making zoning decisions. These were two entirely separate powers and should be considered separate programs.

We do not hold that a City Council could *never* be a single program or activity. We merely hold that those conditions do not exist in this case.[5]

## VI. EQUAL PROTECTION

■ The real problem with the Cleburne ordinance is that it denies equal protection both facially and as applied. In recent years, the formulaic analysis of Equal Protection claims has produced three degrees of scrutiny for courts to apply in analyzing challenged statutes. The levels are generally called "strict scrutiny," "intermediate" or "heightened" scrutiny, and "rational review," *see Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 2394–96, 72 L.Ed.2d 786 (1982); the choice among the three levels depends upon the nature of the statute in question. If the legislative classification disadvan-

365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *see also Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Nectow v. City of Cambridge,* 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928). Moreover, the plaintiffs allege that the statute is unconstitutionally vague. *See Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

**5.** This case is distinguishable from *Grove City College, supra,* where the college was considered a single "program or activity" under the Educational Amendments of 1972 because students received federal tuition aid. The aid, which was not earmarked for any specific program, 687 F.2d at 696–97, would conceivably have ultimately funded every program in the college; but the case reveals no attempt by the school to prove that certain programs were not funded. Instead, the college argued that the funding was indirect, going to students rather than any program of the college itself. *Id.*

tages a "suspect class"[6] or impinges upon the exercise of a "fundamental right," then the courts will employ strict scrutiny. *Plyler v. Doe, supra,* 102 S.Ct. at 2394–95 and nn. 14, 15. The statute must fall unless the government can demonstrate that the "classification has been precisely tailored to serve a compelling governmental interest." *Id.* at 2395.

If the "classification, while not facially invidious, nonetheless give[s] rise to recurring constitutional difficulties," *id.,* it will be tested under intermediate scrutiny. Such difficulties arise, for example, when a statute discriminates against a class which shares some of the characteristics of the suspect classes. *See id.* at 2395–97; *Trimble v. Gordon,* 430 U.S. 762, 767, 97 S.Ct. 1459, 1463, 52 L.Ed.2d 31 (1977); Tribe, *American Constitutional Law,* 1090 (1978). To withstand intermediate scrutiny, the statutory classification must serve important governmental objectives and must be substantially related to the achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976); *see also Plyler v. Doe, supra,* 102 S.Ct. at 2395, *Lalli v. Lalli,* 439 U.S. 259, 265, 99 S.Ct. 518, 523, 58 L.Ed.2d 503 (1978).

If neither strict nor intermediate scrutiny is appropriate, then the statute will be tested for mere rationality. We "seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose." *Plyler v. Doe, supra,* 102 S.Ct. at 2394.

■ In deciding the appropriate level of scrutiny in this case, we note that the plaintiffs have identified no fundamental rights that are impaired by the Cleburne ordinance. Our analysis, then, is limited to whether the class of mentally retarded persons is suspect or at least possesses sufficient characteristics of a suspect class to warrant intermediate review.

Although some district courts have discussed this issue,[7] we can find no appellate opinions directly deciding the proper characterization of mentally retarded persons for Equal Protection analysis.[8] Therefore, we face the issue as one of first impression.

The courts have identified several indicia of the suspect classes. In *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973), the Supreme Court considered whether

> the class is . . . saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary

---

**6.** The courts have identified a number of classifications as inherently suspect. *See, e.g., McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (classification by race); *Oyama v. California,* 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948) (national origin); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage).

**7.** *See Association for Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. 473, 490 (D.N.D.1982) (intermediate scrutiny appropriate for classifications discriminating against mentally retarded persons); *Fialkowski v. Shapp,* 405 F.Supp. 946, 957–59 (E.D.Pa.1975) (same) (*dictum*); *cf. Frederick L. v. Thomas,* 408 F.Supp. 832, 836 (E.D.Pa.1976) (classification discriminating against learning disabled should be tested under intermediate scrutiny) (*dictum*). *But see New York State Assoc. for Retarded Children v. Rockefeller,* 357 F.Supp. 752, 762 (E.D.N.Y.1973) (inmates of state institution for mentally retarded not a suspect class); *Developmental Disabilities Advocacy Center v. Melton,* 521 F.Supp. 365, 371 (D.N.H.

1981) (same); *Anderson v. Banks,* 520 F.Supp. 472, 512 (S.D.Ga.1981) (mentally retarded persons not a "quasi-suspect" class). Some cases have discussed whether mentally *ill* persons are a suspect or "quasi-suspect" class. *See, e.g., Doe v. Colautti,* 592 F.2d 704, 710 (3d Cir.1979) (mentally ill not a suspect class); *Sterling v. Harris,* 478 F.Supp. 1046, 1056 (N.D.Ill.1979), *rev'd other grounds sub nom; Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981) (mentally ill a "quasi-suspect" class). However, mental illness is distinguishable in significant ways from mental retardation, as we discuss *infra* at note 10. Thus, the mental illness cases offer at best only weak analogies to the case at bar.

**8.** *Romeo v. Youngberg,* 644 F.2d 147, 163 n. 35 (3d Cir.1981) (*en banc*) does suggest, however, that mentally retarded persons might be a "discrete and insular" minority deserving heightened scrutiny. *See infra* at 14. *Cf. Abrams v. 11 Cornwall Co.,* 695 F.2d 34, 39 (2d Cir.1982) (discrimination against mentally retarded persons is invidious).

protection from the majoritarian political process.

*Accord, Plyler v. Doe, supra,* 102 S.Ct. at 2394–95 n. 14; *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1964); *see also United States v. Carolene Products Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938). In *Plyler v. Doe, supra,* the Court also noted that

> [s]ome classifications are more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective. Legislation predicated on such prejudice is easily recognized as incompatible with the constitutional understanding that each person is to be judged individually and is entitled to equal justice under the law. Classifications treated as suspect tend to be irrelevant to any proper legislative goal.

102 S.Ct. at 2394–95 n. 14.

Finally, if membership in the minority class is immutable, the Supreme Court is more likely to give the class special protection. *See Parham v. Hughes,* 441 U.S. 347, 351, 99 S.Ct. 1742, 1745–46, 60 L.Ed.2d 269 (1979); *cf. Plyler v. Doe, supra,* 102 S.Ct. at 2396 (minor children of illegal aliens are not in this country voluntarily and, therefore, are not comparably situated to their parents).

Applying these tests to the case at bar, we conclude that although mental retardates are not a suspect class, they do share enough of the characteristics of a suspect class to warrant heightened scrutiny. Discrimination against the mentally retarded is likely to reflect deep-seated prejudice. They have been subjected to a history of unfair and often grotesque mistreatment. Until the 1970s, they were universally denied admittance into public schools in the United States. In addition, the Eugenic Society of America fought during the first half of this century to have retarded persons eradicated entirely through euthanasia and compulsory sterilization. *See Pennsylvania Assoc. of Retarded Children v. Pennsylvania,* 343 F.Supp. 279, 294 (E.D.Pa. 1972). Euthanasia was rejected; but thirty-two states have had statutes providing for the sterilization of retarded individuals. *Id.* at 294 n. 42; *Falkowski v. Shapp, supra* note 7, at 959 n. 9; O'Hara & Sanks, Eugenic Sterilization, *45 Geo.L.J. 30* (1956); *see also Buck v. Bell,* 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927) (upholding Virginia compulsory sterilization law).[9]

Mental retardates have been segregated in remote, stigmatizing institutions. *Cleburne Living Center v. City of Cleburne, supra* note 3, at 9, Finding 32, Trial Transcript at 142; and when permitted in society, they have often been subjected to ridicule, *id.* at 141. Once-technical terms for various degrees of retardation—e.g. "idiots," "imbeciles," "morons"—have become popular terms of derision.

These forms of mistreatment have perpetuated the historical misunderstanding of mental retardation and led to popular fears and uncertainty. The Cleburne ordinance discriminates between the mentally retarded and other groups—e.g. the elderly—that also require supervision but may establish group homes in the R–3 district without a special use permit. This distinction is likely to reflect the deep-seated historical prejudice against the mentally retarded.

In addition, mentally retarded persons have lacked political power. The trial court found that they "historically have been subjected to exclusion from the political process...." *Cleburne, supra* note 3, at 9, Finding 32. Indeed, as of 1979, most states disqualified mentally retarded individuals from voting. Note, *Mental Disability and the Right to Vote,* 88 *Yale L.J.* 1644

---

**9.** The attitude of the past can be read in the words of Justice Holmes:

> We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange indeed if it could not call upon those who sap the strength of the State for these lesser sacrifices ... in order to prevent our being swamped with incompetence.... Three generations of imbeciles are enough.

*Id.* 274 U.S. at 207, 47 S.Ct. at 585.

(1979).[10] Furthermore, political organizations for the mentally retarded have emerged only recently and still possess relatively little power. As the Third Circuit declared in *Romeo v. Youngberg,* 644 F.2d 147 (3d Cir.1981) (*en banc*):

> The mentally retarded may well be a paradigmatic example of a discrete and insular minority for whom the judiciary should exercise special solicitude. *Cf. United States v. Carolene Products,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed.2d 1234 (1938). The retarded cannot vote in most states and, with few community ties, sponsors or friends, have minimal impact on the political process. *See* J. Ely, *Democracy and District,* 135–79 (1980).

*Id.* at 163 n. 35.

Finally, the mentally retarded deserve special consideration because their condition is immutable. Dr. Phillip Roos explained at trial that mental retardation is "irreversible." "[T]here may be some amelioration,

but to date it is not a curable condition." Trial Transcript at 139.

The combination of these factors—historical prejudice, political powerlessness, and immutability—calls for heightened scrutiny of classifications discriminating against the mentally retarded. We are not prepared to say that they are a full-fledged suspect class, however. Strict scrutiny has been reserved for classifications, such as race, that "tend to be irrelevant to any proper legislative goal." *Plyler v. Doe, supra* 102 S.Ct. at 2394–95 n. 14. Though mental retardation is irrelevant to many policies, it *is* a relevant distinction in some cases. For example, learning difficulties may have a bearing on the types of school programs to which a child is assigned or the types of employment for which an adult is qualified. Therefore, we hold that mentally retarded persons are only a "quasi-suspect" class and that laws discriminating against the mentally retarded should be given intermediate scrutiny.[11]

---

**10.** In Texas, both the state constitution and election code provide:

> The following classes of persons shall not be allowed to vote in this state, to wit:
>
> Second: Idiots and lunatics.

Tex. Const. art. VI, § 1; Tex.Elec.Code Ann. art. 5.01 (Vernon Supp 1982). A 1982 opinion of the Texas Secretary of State limited that language to mentally retarded persons who have been adjudicated incompetent. Election Law Opinion DAD–27 (1982). The opinion relied in large part on the Mentally Retarded Persons Act of 1977, Tex.Rev.Civ.Stat.Ann. art. 5547–300, § 2(c) (Vernon Supp.1982).

We do not believe, however, that the mentally retarded have suddenly become politically powerful in Texas. They are still a relatively small bloc, notwithstanding the existence of organizations like the Johnson County Association of Retarded Citizens. Moreover, their right to vote was unclear as late as 1982. The Secretary of State opinion was necessitated by a local judge's decision to bar from the polls a mentally retarded person who had not been adjudicated incompetent. *Id.* The powerlessness of the minority is especially clear in our case, for the Cleburne Ordinance was passed in 1965, long before the Secretary of State Opinion or the Mentally Retarded Persons Act.

**11.** In deciding that classifications against the mentally retarded deserve heightened scrutiny, we express no view about classifications involving the mentally ill. Some courts and com-

mentators have suggested that mentally ill persons are a suspect or quasi-suspect class. *See, e.g., Sterling v. Harris, supra,* 478 F.Supp. at 1053; Note, *Mental Illness: A Suspect Classification,* 83 Y.L.J. 1237 (1974); *but see Doe v. Colautti supra.* The Fifth Circuit has not addressed this issue, except to say in *dictum* that the mentally ill are not a *suspect* class. *See Benham v. Edwards,* 678 F.2d 511, 515 n. 9 (5th Cir. Unit B 1982). The Court explicitly declined to decide whether intermediate scrutiny would be appropriate. *Id.*

In any event, mental retardation is functionally different from mental illness; see *supra* note 2; and the differences cut in favor of heightened scrutiny for the retarded. Mental retardation is not an emotional disorder but a learning problem; it arguably invokes fewer safety concerns than does mental retardation. More important, mental retardation, unlike many mental illnesses, is an immutable disorder. The mentally retarded cannot be cured. *Id.*

Finally, mental illness covers a broader spectrum of disorders and is more difficult to define than mental retardation. The court in *Doe v. Colautti, supra,* 592 F.2d at 711, refused to grant extraordinary protection to the mentally ill:

> a class that is "large, diverse, [and] amorphous...." The concept of mental illness is susceptible to much dispute, and the category encompasses a whole range of disorders, varying in character, and effects.

We note that heightened scrutiny is particularly appropriate in the case at bar, because the Cleburne ordinance as applied withholds a benefit which, though not fundamental, is very important to the mentally retarded. See *Plyler v. Doe, supra,* 102 S.Ct. at 2398; *Tribe, supra* at 1089–90. In *Plyler,* the Supreme Court addressed a Texas statute which withheld from local school districts any funds for the education of children who were not legally admitted into the United States. The statute also authorized local districts to exclude such children from the public schools. 102 S.Ct. at 2389. The Court held that heightened scrutiny was appropriate not only because the children shared some of the characteristics of a suspect class, but also because they were denied an important benefit. Education is not a fundamental right, *id.* at 2397, *San Antonio Independent School District v. Rodriguez, supra,* 93 S.Ct. at 1297; but it is important in helping such children overcome the bias against them and participate in American society:

> The stigma of illiteracy will mark them for the rest of their lives. By denying these children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation. In determining the rationality of [the Texas statute], we may appropriately take into account its costs to the Nation and to the innocent children who are its victims.

102 S.Ct. at 2398.

In the same way, the exclusion of group homes from Cleburne operates to prevent mentally retarded persons from assimilating into and contributing to their society. The trial court found that

> [g]roup homes currently are the principal community living alternatives for persons who are mentally retarded. The availability of such a home in a community is an essential ingredient of normal living patterns for persons who are mentally retarded, and each factor that makes such group homes harder to establish operates to exclude persons who are mentally retarded from the community.

*Cleburne, supra* at 9, Finding 30. Isolated from normal community patterns, they can never hope to adapt. The resulting awkwardness of retarded persons as well as the fact of state-sanctioned isolation further stigmatize the group and provide additional barriers to their hope for self-improvement.

The Ninth Circuit has held in an analogous case that heightened scrutiny is appropriate. *See J.W. v. City of Tacoma,* 720 F.2d 1126 (9th Cir.1983). The Court reviewed a local zoning ordinance that required a special use permit before the establishment of a group home for former mental patients [12] in the R–2 zone.[13] Intermediate scrutiny was held to be applicable because the class shared some of the characteristics of suspect classes and because the ordinance denied important benefits:

> We note ... that the benefits the ordinance restricts are the former mental patients' access to housing and rehabilitative services. While they are not fundamental rights, they like education at issue in *Plyler,* are essential to individuals' full participation in society. Indeed, for former mental patients, a reintegration into society accomplished through living, in a moderately structured setting in a residential neighborhood is an essential part of therapy.

Mental retardation is much more narrowly defined. *See supra* note 1.

**12.** We are not suggesting that former mental patients are identical to the mentally retarded. *See supra* notes 2, 11. However, many of the problems (e.g. the community's fear and distrust) that face mental patients in returning to society are similar to problems faced by the mentally retarded.

**13.** The Tacoma ordinance was arguably less problematic than the Cleburne ordinance, because the Tacoma law provided specific conditions for the issuance of a permit. *See id.* at 1130 n. 5. The Cleburne ordinance has no guidelines at all.

*Id.* at 1129.[14]

For the same reasons, we think that intermediate scrutiny is particularly appropriate in reviewing an ordinance [15] that restricts the availability of group homes for the mentally retarded.

█ In applying that test, we hold that the ordinance is unconstitutional both on its face and as applied. First, the provision itself does not substantially further any important governmental interests. The problem lies not with the interests themselves but with the relevance of the ordinance to those interests. We will assume that all of the legislative goals asserted by the City of Cleburne are substantial. In each instance, however, there is not a sufficiently close correspondence between the goal and the ordinance's means of achieving it. *See Craig v. Boren, supra,* 429 U.S. at 197, 200–204, 97 S.Ct. at 460 (requiring closer fit between legislative objective and statutory means than is required under rational review); Tribe, *supra* at 1083 & n. 10 (same); *see also Trimble v. Gordon, supra,* 430 U.S. at 770–71, 97 S.Ct. at 1465–66; *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 1904 n. 20, 1911 n. 48, 48 L.Ed.2d 495 (1976); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 799–80 n. 13, 39 L.Ed.2d 52 (1974). The standardless requirement of a special use permit for all group homes for the mentally retarded is both vastly overbroad and vastly underinclusive.

For example, the City claims that the objectives of the statute were:

1. to avoid undue concentrations of population;

2. to lessen congestion in the streets;

3. to ensure safety from fire and other dangers; and

4. to protect the health, safety and welfare of the City's population—in particular

    a. to protect the serenity of the existing neighborhoods,

    b. to protect neighbors from harm; and

    c. to protect the mental retardates themselves by providing an appropriate living environment.

*See* Brief of Appellees at 21–24.

The ordinance is irrelevant to the achievement of the first two asserted objectives. The same house with the same number of occupants would be a permitted use so long as the occupants were not mentally retarded. *Cleburne, supra* note 3 at 7, Finding 24. Therefore the ordinance does not control population at all. It merely controls the learning skills of the population.

The ordinance likewise does not control traffic flow. The government has not shown that mentally retarded persons drive more cars or receive more visitors than other people. There is no basis for concluding that traffic will be any more congested

14. Incidentally, although the court relied on these arguments to apply heightened scrutiny, it explicitly left open

    the possibility that, in a case with a record more fully developed as to the characteristics and status of former mental patients, a conclusion that they indeed constitute a suspect class might be warranted.

*Id.* at 1129.

15. The City has argued that the statute does not actually exclude all such group homes but merely requires one additional procedural hurdle. In effect, there is only a possibility of exclusion. Arguably, then we should not adopt heightened review in testing the *facial* validity of the statute as opposed to its application.

    Yet the same possibility obtained in both *Plyler* and *City of Tacoma.* The Texas Ordinance in *Plyler* authorized but did not require

local school districts to exclude undocumented children. Indeed, the Tyler Independent School District had enrolled such children free of charge until 1977 when it required a tuition fee. 102 S.Ct. at 2389 n. 2. The Court tested the provision, however, with more than minimal scrutiny because of the potential exclusion.

    More to the point, the zoning ordinance in *City of Tacoma,* like the Cleburne Ordinance, did not exclude all group homes but merely required a special use permit. The Ninth Circuit tested the statute under intermediate scrutiny again because of the possible denial of an important benefit.

    Thus, the *possible* exclusion here is sufficient to justify our considering the importance of the restricted benefit when we analyze the statute on its face.

because the residents of the Featherston house are mentally retarded. One might argue (though the City has not taken this position) that traffic would be more congested because mentally retarded persons would wander into the streets. Other people do the same, however; and there is no evidence in the record that mentally retarded persons are unusually prone to cause such a hazard. We reject traffic congestion as a goal that is furthered by the ordinance.

The record also fails to support the claim that the ordinance protects the serenity of neighborhoods and shields neighbors from harm. The City produced only one story of a mentally retarded person who had caused a disruption: he had removed some mail from a neighbor's mailbox but later returned it. Moreover, this event did not even take place in Cleburne. See Trial Transcript at 111. Nothing in the record indicates that mentally retarded persons—and particularly those admitted into group homes—are more disruptive or dangerous than other people. On the contrary, Dr. Roos testified that the mailbox incident was not common behavior in moderately retarded persons and was just as possible in most children. Id. at 164. Yet public schools and homes for delinquent children are permitted in the zone. The discrimination between the mentally retarded and other persons is not explained by recourse to neighborhood serenity.

Finally, as to "safety from fire and other dangers," the City does not clarify whether mentally retarded persons will cause the dangers or require special city services when accidents occur. In either event, the City has not proved a substantial relationship between the goal and the ordinance. There is no evidence in the record that mentally retarded persons are more likely than other people to light fires (or cause other hazards). It is conceivable that they might require special care in an emergency. However, the City has never shown that they require more supervision than groups like the elderly whose nursing homes are permitted in the R–3 zone without permits. Nor has the City shown that the existing supervisors in the Featherston house would

provide inadequate care. To treat all homes for the mentally retarded as non-permitted uses is an excessively blunt instrument for achieving fire safety. The City could more appropriately solve this problem by requiring a certain number of caretakers per resident or by setting limits on occupancy. Such requirements already exist in federal and state regulations. See Cleburne, supra note 3, at 6, Finding 20. There is no reason why the City cannot be more specific in delineating its concerns.

The same objection can be raised to the City's general claim that the ordinance serves to protect the health, safety, and welfare of mentally retarded persons—by insuring, for example, that group homes are well constructed, safely located, and not over-crowded. The City could serve these interests in a much more direct manner by setting specific requirements to guide the judgment of the City Council. The alternative (embodied in the Cleburne ordinance) of giving the city council complete discretion to bar all group homes is too dangerous. There is too great a potential for blanket discrimination, fueled by the very fears and prejudices that drove neighbors in this case to petition the City Council against the Featherston Home. We cannot sanction such unbridled discretion in dealing with a class that has suffered a history of mistreatment and political impotence. The Cleburne provision requiring a special use permit for mental retardates' group homes is facially invalid under the Equal Protection Clause.

That holding alone would be sufficient to decide this case. The ordinance provision was unconstitutional; therefore it could not be invoked to exclude the Featherston Home. However, even if the statute were facially constitutional, the City Council's decision in this case would have violated equal protection. Again, the decision must be tested under intermediate scrutiny; and we hold that the denial of a permit for the Featherston Home did not substantially further any important government interest justifying the discriminatory classification.

The factors going into the Council's decision were:

(a) the attitude of a majority of owners of property located within two hundred (200) feet of 210 [sic] Featherston;

(b) the location of a junior high across the street from 201 Featherston;

(c) concern for the fears of elderly residents of the neighborhood;

(d) the size of the home and the number of people to be housed;

(e) concern over the legal responsibility of CLC for any actions which the mentally retarded residents might take;

(f) the home's location on a five hundred (500) year flood plain; and

(g) in general, the presentation made before the City Council.

*Cleburne, supra* note 3, at 9–10, Finding 34.

The final factor (g) is too ambiguous to justify discrimination; and two more (a and c) do not serve substantial interests. The prejudices and fears of neighbors are not in themselves legitimate bases for discrimination.

The location of a junior high across the street from the Featherston Home (factor b) raises an arguable concern that the students would tease or abuse residents of the home. However, that danger seems minimal, since about thirty students are themselves mentally retarded. *Cleburne, supra,* note 3, at 6, Finding 21. More important, the very purpose of living in a community group home is to confront and learn to handle society's obstacles. If we accept that the hostility of junior high students is a substantial concern, then any hostility may become the justification for denying a use permit. In effect, prejudice becomes its own excuse. We cannot accept that as a substantial interest, particularly given the speculative, unsupported nature of the City's allegations.

The size of the home and the number of people to be housed are important interests; but they are not substantially served by denying the permit in this case. The Featherston Home has four bedrooms and two baths and will house thirteen people. The structure contains 2700 square feet and

is located on a lot that is 156 feet long by 103 feet wide. Citing a recent Texas regulation that limits group homes to six residents, the City argues that residents of the Featherston Home will be too crowded. The regulation only applies to applications made after May 1, 1982 and, therefore, does not govern the Featherston Home; but the City feels that the regulation indicates the needs of mentally retarded persons. However, the existence of the regulation does not explain Cleburne's discrimination between the mentally retarded and others. The City never justifies its apparent view that other people can live under such "crowded" conditions when mentally retarded persons cannot. Moreover, assuming that the City would be comfortable with six residents, it has never justified the difference between six and thirteen persons. The only discussion of this question came from Dr. Roos who knew of "no research evidence indicating that a group home with six does a better job than a group home with fifteen." Trial Record at 161. In sum, the City has never proven that the mentally retarded have unusual space needs or that denying the Featherston permit serves that interest.

The stated goal of insuring CLC's legal responsibility for the actions of its residents is not sufficiently important. Nowhere in the briefs or the record do we find an explanation why mental retardates alone must prove their financial solvency to live in Cleburne. Nor do we find any explanation of how CLC fell short.

Finally, the argument that the Home would be in a 500 year flood plain seems somewhat strained. Though the safety of the residents is important, the danger of a flood every five hundred years is not particularly great.

In sum, none of the proffered reasons for denying the Featherston permit substantially served an important government interest. The application of the ordinance denied equal protection.

## VII.  STANDING OF JCARC

■  The Johnson County Association of Retarded Citizens has asserted standing to

litigate this suit in its own right and as a representative of its members. The trial court held that the association had failed to prove any injury to itself or to its members. Therefore, it failed to satisfy the requirements for standing.

We affirm, for the reason given by the trial court. The JCARC has not shown any injury to its members. Although it claims that some of its members are potential residents of the Featherston Home, it has never identified any individuals who actually desire to live there. Thus, it is impossible to tell if any of the members were actually harmed by the City Council's action. *See Warth v. Seldin;* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

Nor has the JCARC proven a sufficient injury to its own interests. The association's activities include "promoting the general welfare of mentally retarded people, fostering the development of programs on their behalf, and advising and aiding parents of mentally retarded persons in the solution of their problems in this area." Brief of Appellant at 3. In particular, the JCARC favors the development of group homes; and the City Council's decision allegedly impairs this interest. However, the association's interest seems no different from that of the low-income housing association denied standing in *Warth v. Seldin, supra.* The injury to the JCARC's "abstract social interests" is too intangible to justify standing. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

The association would have standing if it proved that (1) it provides counseling and referral services for mentally retarded persons seeking group homes, and (2) it has had to devote significant resources to combatting the City Council's discrimination. *Id.* However, it has not yet proven any drain on its resources, so it does not come within the *Havens* formula.

In future cases, the JCARC can put forth evidence proving such an injury, or it can show that one of its members actually desires to live in the contested group home.[16]

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

---

**16.** Admittedly, we have provided the JCARC with a formula for establishing standing in its future litigation. There is high precedent for giving such advice. *See Sierra Club v. Morton, supra,* 92 S.Ct. at 1366.