**CLEBURNE LIVING CENTER, INC., et al., Plaintiffs-Appellants,**

v.

**CITY OF CLEBURNE, TEXAS, et al., Defendants-Appellees.**

No. 82–1565.

United States Court of Appeals, Fifth Circuit.

July 6, 1984.

Renea Hicks, Advocacy, Inc., Austin, Tex., for plaintiffs-appellants.

Earl Luna, Dallas, Tex., for defendants-appellees.

ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

(Opinion March 5, 1984, 5 Cir., 1984, 726 F.2d 191)

Before CLARK, Chief Judge, GOLDBERG and POLITZ, Circuit Judges.

PER CURIAM:

The Petition for Rehearing is DENIED and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Federal Rules of Appellate Procedure and Local Rule 35) the Suggestion for Rehearing En Banc is also DENIED.

Before CLARK, Chief Judge, BROWN, GOLDBERG, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge, with whom BROWN, GEE, REAVLEY, JOLLY and DAVIS, Circuit Judges, join, dissenting.

I respectfully dissent from the denial of a rehearing en banc.

The panel has made a holding no other federal appellate court has: that state regulations treating the mentally retarded differently than others are on that account facially invalid if they fail to meet the "intermediate" or "heightened" scrutiny test applicable to classifications such as those based on gender or legitimacy, notwithstanding that the regulatory distinctions in question are rationally based and impair no fundamental rights.[1] I believe this holding not only to be significantly wrong, but also, due to its exceptional importance and novelty, to clearly deserve our en banc consideration.

It is both a cliche and a fundamental truth that equality does not demand treating materially different conditions in the same manner. Hence, where fundamental rights are not concerned, a threshold requirement for scrutiny beyond the rational basis level should be that the group singled out for special treatment be not generally, or with respect to the field of regulatory subject matter under consideration, significantly different, as a result of its defining characteristics, from the rest of society in terms of its needs and abilities to function. Where difference in treatment should rationally be expected, it is indeed an ill-advised rule that treats its presence as quasi-suspect.

Classification based on mental retardation is generically different from that based on gender or legitimacy, the prototypical "quasi-suspect" classifications. Under the broadly held and judicially accepted view, women and illegitimates are not generally different from the rest of society in terms of their needs and abilities to function. Women have as much need for, and ability to benefit from, the same kinds of

---

**1.** The district court held the regulatory distinctions here at issue to be rationally based. The panel did not reach that question, and hence neither does this dissent, which is directed only to the rule announced by the panel. The panel likewise held there was no impairment of fundamental rights.

education as men,[2] and illegitimate children have as much need for, and can equally benefit from, parental support as legitimate children. Thus, for example, governmental distinctions between the sexes respecting education, or between legitimate and illegitimate children respecting the obligation of parental support, are quasi-suspect. The mentally retarded present a wholly distinct situation.[3] They *are* materially different from the rest of society, and are so as a result of their class-defining characteristics.

The characteristics which define the retarded as a class—the presence from birth or early childhood of an incurable, though ameliorable, significant deficit in intellectual development and social adaptation—bear heavily on the individual's needs and abilities to perform or contribute to society over an extremely wide range of functions, and are highly relevant to proper legislative goals in most respects.

And, in respect to the appropriate living, caring, and educational environment, the general subject under consideration here, the retarded are meaningfully different not only from nonretarded generally but also from other groups for which special arrangements in these respects are often made: the very young, the very old, the mentally or physically ill. This, of course, was recognized by plaintiffs' expert in the present case in his testimony quoted in the panel opinion (note 12) that mental retardation and mental illness are "conditions requiring entirely different approaches." It is likewise obvious that entirely different approaches are also required in respect to the retarded and the very young, or the very old, or the physically ill. Clearly that, too, is recognized by the plaintiffs here, who seek to create an environment *restricted* to and specifically designed for the retarded. Plaintiffs here do not want a children's day-care facility or a hospital. The retarded, *as such,* are not hospitalized or placed in nursing homes. In short, the retarded, often with minds at or below third-grader level in the bodies of otherwise relatively healthy adults, present a *special* set of needs, requirements, and problems unique to their condition.

As "entirely different approaches" are required respecting the retarded, are we nevertheless to treat the presence of difference in approach as "quasi-suspect"? It is entirely too facile to suggest that we do so only when the difference disadvantages the retarded. Is it an "advantage" or a "disadvantage" to be under twenty-four-hour supervision by professional staff (as the panel opinion reflects is the plan for the proposed facility here)? That may often depend on whether or not the person supervised is retarded. If so, the issue is not so much one of equality, but of *entitlement* to special, particular treatment. Moreover, some may think a given distinction helpful to the retarded, others not. Is the decision to apply "heightened" scrutiny dependent on whether the majority of "experts" think the distinction helpful to the retarded? Are all states frozen in the current "majority" view? If so, is innovation then "quasi-suspect"?[4] Are we to review as "quasi-suspect" the failure of governmental facilities for the retarded to have every item of equipment or design characteristic found in

**2.** The same may be said with respect to legal and illegal alien children.

**3.** As observed in *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973):

"... what differentiates sex from such *nonsuspect statuses* as *intelligence* or physical disability, and aligns it with the recognized suspect criteria, is that the *sex characteristic frequently bears no relation to ability to perform or contribute to society.*" (Emphasis added.)

**4.** In Justice Brandeis' famous words: "Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory ...." *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting). The panel opinion appears to regard the integrative model as the preferred method of aiding the retarded. *See* At 199 ("Isolated from normal community patterns, they can never hope to adapt."). Are other models constitutionally "quasi-suspect"?

municipal hospitals or to require staff educational attainments mandated for the hospitals? How are funding levels to be compared? Obviously, these observations suggest only the smallest fraction of the myriad of areas in which governmental practices may distinguish between the retarded and the nonretarded, but where judgment as to the constitutional validity of a given distinction made on that basis is not meaningfully aided by asking whether the distinction is advantageous to the retarded.

The factors relied on by the panel for its determination that the retarded are a quasi-suspect class [5] should not alone suffice for such purpose, absent the class' meeting a threshold level of lack of significant dissimilarity from the rest of society, arising from the class' defining characteristics, in terms of its member's needs and abilities to function, either generally or in respect to the regulatory area under consideration. The panel factors in no way mitigate the contradictory nature of "quasi-suspecting," as being unequal, the different treatment of conditions that are significantly different. Indeed, the panel factors tend to increase in strength with the degree of retardation and the concomitant increased appropriateness of disparate treatment.[6] Where the need for greater differences in treatment is most evident—the severely and profoundly retarded—the classification is the most suspect.

State regulations will inevitably often distinguish between the retarded and others. To invalidate these distinctions where they are rationally grounded and do not impair fundamental rights, on the basis of the same test that we use to invalidate distinctions based on gender, constitutes in my view a major and unwarranted extension of federal judicial power, to the substantial prejudice both of the judicial function and the principles of federalism. The unprecedented rule announced by the panel tells us, I fear, significantly more about the institutional powers of the federal judiciary than it does about the proper state treatment of the retarded. Before we thus expand our own powers I believe the states, and those charged with the legislative and executive functions, should at least be afforded a review en banc.

PATRICK E. HIGGINBOTHAM, Circuit Judge, with whom JOHN R. BROWN, Circuit Judge, joins, specially concurring in the dissent:

I join the dissent from the denial of en banc rehearing. I share the concerns so well expressed by Judge Garwood's dissent, but it is not necessary to reach a final judgment without the benefit of oral argument and collegial effort and I stop short of doing so. Only the case for en banc consideration need now be made and the dissent has done that. We have recently been willing to convene en banc solemnly to deliberate diversity cases whose vitality wholly depends on the next state court decision. *Sturgeon v. Strachan Shipping Co.*, 731 F.2d 255, 260 (5th Cir.1984) (en banc) (Rubin, J., dissenting); *Edwards Co. v. Monogram Industries, Inc.*, 730 F.2d 977, 987 (5th Cir.1984) (en banc) (Rubin, J.,

---

**5.** The factors cited by the panel (At 197–98) may be summarized as follows: (1) "likely to reflect deep-seated prejudice"; (2) "history of unfair and often grotesque mistreatment," including "universally denied admittance into public schools" (until 1970's), segregation "in remote, stigmatizing institutions," and "often been subjected to ridicule"; (3) "have lacked political power"; (4) "their condition [though ameliorable] is immutable."

**6.** I believe it fair to assume that, to the extent the public tends to react toward the retarded differently than toward the nonretarded, the differences in reaction are greatest with respect to those whose retardation is more pronounced, and least with respect to the marginally retarded (those with, say, an IQ at or only slightly below 70). Certainly, the marginally retarded are far more likely to attend public schools, and far less likely to be "in remote, stigmatizing institutions," than those with more pronounced retardation. In terms of their ability to be trained so as to increase their social adaptive behavior to approach minimal levels necessary to function in society, the condition of the marginally retarded is certainly less "immutable" than that of those whose retardation is more pronounced. With respect to political power, the marginally retarded are more likely to vote (*see* panel opinion, note 10).

concurring). I am puzzled, then, that a case which implicates government's relationship with a uniquely insular minority and reexamines the relative roles of federal and state governments and their branches in their superintendence would not be deemed by a majority of this court worthy of en banc consideration.