463 So.2d 1276 (1985)
C.J. CLARK and Lois Clark
v.
Irving MANUEL, Bonnie Manuel and the Lafayette Association For Retarded Citizens, Inc.
No. 84-CC-1601.
Supreme Court of Louisiana.
February 25, 1985.
*1278 Stephen H. Myers, Davidson, Meaux, Sonnier, & McElligott, Anthony M. Fazzio, Fazzio & Saitha, Lafayette, for defendants-relators.
Gregory B. Dean, Dean, Lomenick, Seeman & Willis, Lafayette, for plaintiffs-respondents.
CALOGERO, Justice.
In this lawsuit to prevent the use of a residence in Scott, Louisiana by the Lafayette Association of Retarded Citizens, a non-profit corporation, we are called upon to construe a restrictive covenant, applicable to lots in the subdivision in which the residence is located, and to apply the mental retardation law enacted in 1978 and succeeding years.
The Lafayette Association of Retarded Citizens, LARC, leased from Irving and Bonnie Manuel, a residence located on Lot 13 of the Westgate Subdivision in the Town of Scott. LARC intended to establish in the residence a community home for retarded individuals. Lot 13, and all of the other numbered lots in Westgate Subdivision were encumbered with the following building restrictions:
"1. All of the lots located in Westgate Subdivision which are numbered, those being Lots 1 through 53, shall be used exclusively for residential purposes.
. . . . .
"2. No structures shall be erected, altered, placed or permitted to remain on any residential building lot, other than one detached, single family dwelling not exceeding two and one-half stories in height, and a private garage and other out buildings incidental to residential use of the plot."
C.J. and Lois Clark, who own and reside in a house in the subdivision, secured a restraining order and sought a preliminary injunction to prevent LARC from operating the community home. They complained that LARC's proposed use of the structure on Lot 13 was in violation of the building restrictions, and that LARC had failed to obtain approval of the site for a community home, as required, they contend, by La. Rev.Stat.Ann. § 28:478(C). The parties agreed that LARC had indeed not sought approval for the site of the community home from the local governing authority, the council of the Town of Scott.
The trial judge, in granting the preliminary injunction, found that LARC's activities violated the building restrictions which attached to each lot in the subdivision. She did not, therefore, reach the matter of failure to obtain the required governmental approval of the site. The Court of Appeal took the case up on supervisory writs and affirmed the judgment granting the injunction. Their opinion was based upon LARC's non-compliance with R.S. 28:478(C), and violation of the "building restriction." R.S. 28:478(C) apparently requires that the local sponsor of a community home for retarded individuals secure site approval from the local governing body. Since LARC did not first seek or secure the required site approval, the home in the subdivision could not, the Court of Appeal *1279 determined, "be considered a community home [and thus a "single family unit"] under LSA-R.S. 28:381(8)[1] or [28:] 477(1)." Without the benefit of the "single family unit" sanction (R.S. 28:477(1)) which presumably would flow from compliance with R.S. 28:478(C), the Court of Appeal found "the activities of LARC in providing for the residence of individuals not members of a single family unit violates the building restriction, and that the trial court properly issued a preliminary injunction prohibiting such activity."
We will first address the restrictive covenant which applies to the Manuels' Lot 13 in Westgate Subdivision. Restrictive covenants are, of course, to be construed strictly.[2] These particular restrictions provide only that (1) with respect to use, the lots are to be used for residential purposes and (2) with respect to the erection of structures on each lot, none shall be erected "other than one detached, single family dwelling not exceeding two and one-half stories in height, and a private garage and other out buildings incidental to residential use of the plot." Relative to the latter, erection of structures, the parties concede that the Manuels' house on lot 13, as erected or modified, is indeed one detached dwelling not exceeding two and one-half stories in height, etc., and that the structure is one which all would agree is built to accommodate single family living, as is commonly perceived.[3] And, although the restrictive covenant prevents erection of any type structure other than a "single family dwelling," there are no limitations upon the number of permitted occupants of such dwelling nor any requirement that the occupants be related. With respect to the former, that is, use for residential purposes, the covenant's limitation is merely that the lots be used for residential purposes alone. LARC's community home for mentally retarded persons is surely a residential purpose. That the home's occupants are being afforded training so as to live in a community rather than institutional environment, and so as to adjust to residential living, does not convert that use to one which is commercial or nonresidential. The occupants' training, to function in the community and in a residential environment, is not unlike that afforded children in the residential settings which constitute their and their parents' homes. Webster defines "reside" as "to dwell permanently or continuously" and "residence" as "the act or fact of dwelling in a place for some time." The individuals to be placed in this community home by LARC intend to remain for an indefinite period, i.e., on a permanent basis, and would clearly be residents, those "who reside in a place," under the criteria provided by Webster. Webster's New Collegiate Dictionary 977 (1980).
The restrictive covenant which attaches to Lot 13, Westgate Subdivision, is not violated by LARC's proposed use of the property which they have leased from the Manuels.
The foregoing resolves one principal issue in the case. The restrictive covenant is simply not offended by LARC's proposed use of the lot and structure thereon. The lot will be used for a residential purpose. And no structure has been erected, altered, placed or permitted to remain other than "one detached single family dwelling ..."
Respondents rely, however, upon another argument to bar LARC's proposed use of the residence. They point to R.S. *1280 28:478(C), which seems to require that a party seeking a license from DHHR to open a community home must first secure site approval from the local governing authority, in this instance, the council of the town of Scott, Louisiana. This subsection is located in Chapter 5, "Group Home for Handicapped Persons Act," of Title 28 of the Revised Statutes.
Louisiana's statutory provisions concerning mental retardation have been adopted by several enactments commencing in 1978. As amended, Chapters 4 and 5 now comprise this state's attempt to develop a system to provide services, including non-institutional living options for mentally handicapped individuals.
Chapter 4, entitled Mental Retardation and Developmental Disability Law, was enacted by 1978 La.Acts No. 680 § 2, and was amended on several occasions before it was amended and reenacted by 1982 La.Acts No. 538. The reenacted statute was itself amended by 1983 La.Acts No. 659 § 1 in order to make the entire chapter applicable to developmental disability as well as to mental retardation. In providing a system of services to the mentally retarded or developmentally disabled, Chapter 4 proposes to protect the basic human rights of such Louisiana residents. La.Rev.Stat.Ann. § 28:380(B). Among the rights expressly granted by the legislature in this chapter is the right "[t]o live in the least restrictive residential living option appropriate to [the retarded person's] individual needs and abilities, including ... community homes." § 390(B)(1).
Chapter 4 of Title 28, it has been suggested, was in large measure a legislative reaction to the mandates of United States District Court Judge Alvin B. Rubin in Gary W. v. State of La., 437 F.Supp. 1209 (E.D.La.1976).[4] In that decision, the court required the state to develop treatment plans for handicapped children placed in Texas institutions by direct action, or with financial support from, the State of Louisiana. In devising each treatment program, the state representative was required to consider the "least restrictive" alternative for that child, although it was not required that there be developed an entire new system of facilities to implement this plan. Chapter 4 of Title 28 is the state's attempt to create a system of care and treatment for its mentally retarded citizens.
In 1981, in the exercise of its police power,[5] the Louisiana Legislature passed Act 892, effective August 2, 1981, in order, as the title of the act provides, to promote "community facilities for the care of mentally and physically handicapped persons, to allow small community homes to be permitted in all residential districts zoned for multiple family dwellings, and otherwise to provide with respect thereto."
A House Committee report on Senate Bill 596 (later, Act 892) indicates that extensive hearings, conducted in 1980-81 on the subject of group homes, determined that legislation was needed to facilitate the establishment of such living arrangements for handicapped persons. At that time, only 235 beds were available in the entire state to enable handicapped citizens to live in their own communities, and these were limited to the cities of Shreveport, New Orleans, Baton Rouge and Lake Charles, according to testimony presented at the June 26, 1981 meeting of the House Committee on Health and Welfare. While it is not especially pertinent to the narrow legal question we resolve in this opinion,[6] we deem it worth noting that one effort to amend the bill, to make clear that insofar as the state's policy is concerned local zoning requirements would remain paramount, failed. It was defeated when opponents *1281 argued that certain groups would do "everything possible" to keep a group home out of their neighborhoods (presumably including bringing pressure to bear on those responsible for designing and enforcing zoning ordinances).
Act 892 of 1981, which became Chapter 5 of Title 28 ("Group Home for Handicapped Persons Act") was designed primarily if not exclusively to promote community homes. The act became La.Rev.Stat.Ann. 28:475-478. It provides in full:
§ 475. Short title
This Chapter shall be known and may be cited as the Group Home for Handicapped Persons Act.
§ 476. Declaration of policy
The legislature hereby declares that it is the policy of this state as declared and established in this Title and in the mental retardation law and in the mental health law that mentally and physically handicapped persons are entitled to live in the least restrictive environment in their own community and in normal residential surroundings and should not be excluded therefrom because of their disabilities. The legislature further declares that the provisions of this Chapter are intended to secure to all of the citizens of this state the right to individual dignity as provided in Article I, Section 3 of the Constitution of Louisiana and to protect the rights and promote the happiness and general welfare of the people of this state. To that end, the legislature hereby declares that the provisions of this Chapter are an exercise of the police power reserved to the state by Article I, Section 4 and Article VI, Section 9(B) of the Constitution of Louisiana.
§ 477. Definitions
As used in this Chapter, unless otherwise clearly indicated, these words and phrases have the following meanings:
(1) "Community Home" means a facility certified, licensed, or monitored by the Department of Health and Human Resources to provide resident services and supervision to six or fewer handicapped persons. Such facility shall provide supervisory personnel in order to function as a single family unit but not to exceed two live-in persons.
(2) "Department" means the Department of Health and Human Resources.
(3) "Handicapped Person" means any person who has a physical or mental impairment which substantially limits one or more of the following major life activities: 1) self care; 2) receptive or expressive language; 3) learning; 4) mobility; 5) self direction; 6) capacity for independent living; 7) economic self sufficiency. This definition shall not include persons handicapped by reason of drug abuse or alcohol abuse, nor shall it apply to handicapped persons currently under sentence or on parole from any criminal violation or who have been found not guilty of a criminal charge by reason of insanity.
§ 478. Promotion of community based homes
A. In order to achieve uniform statewide implementation of the policies of this Title and of those of the mental retardation law and of the mental health law, it is necessary to establish the statewide policy that community homes are permitted by right in all residential districts zoned for multiple-family dwellings.
B. The department shall establish appropriate standards with interpretative guidelines and establish monitoring procedures. In no case shall a community home be placed within a one thousand foot radius of another community home.
C. The local sponsor shall notify the local governing authority of his intent to file an application to the department to open a community home. In any area over which a local planning commission has jurisdiction the site selection shall first be submitted to the local planning commission, which shall recommend approval or disapproval of the site to the local governing authority. The local governing authority shall then affirm or reverse the decision of the planning commission by a majority vote of its entire membership, within forty-five days of the date of the original notification to the *1282 local planning commission. In any area in which there is no local planning commission, the local governing authority shall approve or disapprove the site within forty-five days from the date of the original notification to the local governing authority. Whenever the local governing authority has disapproved the site, the local sponsor and the department may develop an alternate site selection for the community home which is acceptable to the local sponsor, the local governing authority, and the department.
As amended and passed by the Legislature, Section 478 might be viewed as ambiguous.
Section A establishes the statewide policy that community homes (facilities licensed by DHHR to provide residential services and supervision to six or fewer handicapped persons, and not more than two live-in persons functioning as a single family unit) "are permitted by right in all residential districts zoned for multiple family dwellings."[7]
Then Section C, apparently applicable to community homes in residential districts zoned for multiple family dwellings (to which reference is made in Section A), as well as to community homes in residential districts zoned more restrictively, or less restrictively than for multiple family dwellings, as well as to community homes in areas of the state without zoning restrictions at all, recites essentially that local sponsors shall notify "the local governing authority" of an intent to file an application to DHHR to open a community home, and thereafter secure approval of their chosen site from the local governing authority, with prior submission to the local planning commission (except where there is no local planning commission).
It is not patently clear that a local sponsor whose community home is in a residential district zoned for multiple family dwellings, where "permitted by right" (R.S. 28:478(A)), must apply for approval of their site from the local governing authority, under R.S. 28:478(C). Presumably, however, even that local sponsor must apply for and secure site approval from the local governing authority. Constitutionally (La. Const.1974 art. VI, § 17), it is the local governmental subdivisions which are authorized to "adopt regulations for land use zoning and historic preservation...." And the statute, R.S. 28:478(A), merely establishes (the words are "it is necessary to establish") "a statewide policy," ("that community homes are permitted by right in all residential districts zoned for multiple family dwellings.") (emphasis provided)
In any event in order to decide the case before us, we have to interpret these provisions.
As applied to a "local sponsor" whose chosen site is in a zoned district, the applicant must secure site approval from the local governing authority, whether the applicable zoning ordinance does or does not bar a "community home" in the particular zoned area.
And, as applied to a local sponsor like LARC whose chosen site is in an unzoned district (in the town of Scott),[8] the statute requires an applicant whose site has no zoning restrictions to secure the approval of the local governing authority, which, given the right statutorily under 28:478(C) to approve or disapprove, presumably has absolute discretion in the matter.
As the statute's title recites, Act 892 of 1981 was designed to promote community facilities for the care of mentally and physically handicapped persons. In fact, however, the statute, at R.S. 28:478(C) imposes a restriction on the local sponsor/DHHR applicant desiring to open a community home. Without applicable zoning limitations and free of restrictive covenants, the *1283 local sponsor like LARC in this case finds itself under the statute subject to the discretionary approval (or disapproval) of a local governing authority.
Recognizing the impediment presented by R.S. 28:478(C), LARC and the Manuels argue that R.S. 28:478(C) was abrogated, or effectively repealed by R.S. 28:381(8)'s defining "community home," in 1982. (R.S. 28:381(8) appears in Chapter 4, "Mental Retardation and Developmental Disability Law," and forms part of Act 538 of 1982.) This definition establishes that community homes of six or fewer mentally retarded individuals "shall be considered single family units." The statute came after the enactment of Chapter 5 with its R.S. 28:478(C) in 1981, and after the Second Circuit decision in City of West Monroe v. Ouchita Ass'n for Retarded Children, Inc., 402 So.2d 259 (La.App. 2d Cir.1981).[9] Applicants urge that the two statutes are contradictory since R.S. 28:381(8) facilities establishing community homes, while R.S. 28:478(C) permits local governing authorities to veto their establishment discretionarily and with impunity.
We cannot conclude that the Legislature intended by implication to repeal the provisions of R.S. 28:478(C) passed in 1981, when in 1982 it passed R.S. 28:381(8). Such a conclusion is unwarranted unless there is no way to reconcile the two enactments. The statutes are not irreconcilable. In fact, the definition of community home in R.S. 28:381(8) ("community homes ... shall be considered single family units") adds little to what had already appeared in R.S. 28:477, a companion provision to R.S. 28:478(C) in Chapter 5. That section (§ 477), passed with R.S. 28:478(C) in 1981, also provides that a community home "function[s] as a single family unit."
Given that R.S. 28:478(C) is a currently effective statute and that it serves as an impediment to relators in this case, we turn our attention to the contention that it is unconstitutional.
We know of no other owner or lessee of property in this state not adversely affected by zoning restrictions who is similarly required to secure approval of a local governing authority before putting property to a legal use.[10] The Legislature has seen fit, however, to require those who would use property as a community home for mentally retarded persons first to secure approval from the local governing authority before establishing a community home. The Legislature may normally, of course, discriminate in their regulatory enactments. They may not, however, run afoul of the equal protection clauses of the United States and Louisiana Constitutions.
The fourteenth amendment, for an independent constitutional guarantee, commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This guarantee includes all governmental actions which classify individuals for different benefits or burdens under the law. Although the equal protection *1284 clause does not reject the government's ability to classify persons in the creation and application of laws, it does guarantee that the classifications will not be based upon impermissible criteria or arbitrarily used to burden a particular group. The determination of whether a classification can be said to meet the equal protection guarantee depends on the purpose which one attributes to the legislative act and the degree of relationship between the end sought and the group affected. Since it will normally be rare to find a classification which promotes only a narrowly defined end, the conclusion as to whether a statute affecting only a limited class comports with the equal protection clause is largely dependent on what standard of review is to be applied. Generally, these are "rational basis" (is the legislation which creates the classification rationally related to a legitimate state interest?), "means scrutiny" or heightened scrutiny (is it substantially related to an important governmental objective?) or "strict scrutiny" (is it necessary to promote a compelling state interest?) The United States Supreme Court has found that economic classifications and those dealing with general social welfare regulation need only be rationally related to a legitimate governmental objective. Only classifications which infringe upon certain fundamental constitutional rights or classifications which disadvantage "discrete and insular minorities"[11] will be subjected to strict scrutiny. And legislation of this sort will be upheld only if necessary to promote an extremely important or compelling end of government. See J. Nowak, R. Rotunda, J. Young, Handbook on Constitutional Law 515-35 (1978).
In the traditional equal protection analysis the initial determination is whether a given act disadvantages a suspect class or infringes upon a fundamental right. If it does not, then the act need only rationally further some legitimate, articulated state purpose or goal. This level of scrutiny rarely renders an act constitutionally infirm. However, with a finding that a suspect class or fundamental right is involved, an act will frequently fall short of "promoting" a compelling state interest, the strict scrutiny level of review. It is therefore not surprising that courts are reluctant to define as suspect any but the most arbitrary classifications. In fact, only classifications based upon race have been uniformly treated as suspect.
Other classifications, such as those based on gender and illegitimacy have been categorized as quasi suspect and subjected to a "means scrutiny" test, a middle tier between strict scrutiny and rational basis (Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971)), in the assessment of these constitutional considerations. According to the Reed court, "a classification `must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation....'" Id. at 76, 92 S.Ct. at 254 (quoting Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)).
A recent United States Fifth Circuit Court of Appeal decision, Cleburne Living Center v. City of Cleburne, Texas, 726 F.2d 191 (5th Cir.1984),[12] has applied a middle tier level of scrutiny to statutes which affect the mentally retarded. In so doing, the court noted that although some district courts have discussed the issue of whether the class of mentally retarded persons is suspect, no other appellate opinion had addressed the issue. In deciding this issue of first impression, the Fifth Circuit examined the several indicia of suspect classes which other courts have identified.
In San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 18, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973), the *1285 United States Supreme Court had considered whether
the class is ... saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.
In Plyler v. Doe, 457 U.S. 202, 216-17 n. 14, 102 S.Ct. 2382, 2394-95 n. 14, 72 L.Ed.2d 786 (1982) the United States Supreme Court noted that
[s]ome classifications are more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective. Legislation predicated on such prejudice is easily recognized as incompatible with the constitutional understanding that each person is to be judged individually and is entitled to equal justice under the law. Classifications treated as suspect tend to be irrelevant to any proper legislative goal.
And, if membership in a minority group is immutable, special protection is more likely afforded the class by the United States Supreme Court. See Parham v. Hughes, 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979).
In applying these tests to the class of mentally retarded individuals, the Fifth Circuit concluded that they share enough of the characteristics of a suspect class to warrant at least heightened scrutiny. Of significance in their quest for special consideration is the fact that their condition is immutable. It was noted in Cleburne, supra that until the 1970's admittance into public schools in the United States was universally denied the mentally retarded, and, that, in the first half of this century, an organization sought to eradicate the retarded through euthanasia and compulsory sterilization.[13] As part of this pattern of mistreatment, mentally retarded persons have been segregated in remote, stigmatizing institutions, which has perpetrated the historical misunderstanding of such individuals and led to widespread fears and uncertainty. Further, this group, which has been disqualified from voting in most states, can truly be said to lack political power. The United States Fifth Circuit Court of Appeal concluded that this combination of factors historical prejudice, political powerlessness, and immutability calls for heightened scrutiny of any legislation which discriminates against mentally retarded individuals. The classification of mental retardation may well be relevant in some cases, such as the types of school programs to which a child is assigned or the types of employment for which an adult is qualified. The court in Cleburne refused, therefore, to apply the strict scrutiny standard of review. This three judge panel of the United States Fifth Circuit concluded that mentally retarded individuals are a "quasi-suspect" class and that intermediate scrutiny is required for laws discriminating against them.
The logic of the decision in Cleburne is compelling. Heightened scrutiny is particularly appropriate in a case where, as here, the statute makes it more difficult for this class to enjoy an important right.[14] In the absence of the individual's own family or a suitable foster home placement, group homes are the principal alternative for community living for the mentally retarded.[15] The availability of such homes is necessary for the development of normal living patterns, and obstacles to the establishment *1286 of group homes serve to exclude mentally retarded individuals from the community.
The briefs and lower court opinions have not extensively addressed the state's objectives in requiring the sponsor of a group home to obtain local approval of the site, while not requiring other owners or lessors to do the same.[16] In the federal case cited above, the City of Cleburne unsuccessfully urged that a zoning ordinance which specifically excluded group homes from the permitted uses in an apartment district had as its objectives the avoidance of undue concentrations of population, the lessening of congestion in the streets, the protection of the health, safety and welfare of the City's population by protecting the serenity of the neighborhoods and by protecting the neighbors and the retardates from harm. To withstand the heightened scrutiny appropriate for a quasi-suspect class, the government's classification must both serve an important governmental objective and be substantially related to achieving that objective. Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). Accepting that such governmental objectives are important, there is no substantial relationship between these purposes or any of them and the restriction on the establishment of group homes imposed by R.S. 28:478(C). R.S. 28:478(C) is irrelevant to concerns about concentrations of population and congestion in the streets. If the occupants were not mentally retarded, the same house with the same number of residents and even with the same number of potential drivers would be a permitted use. Nevertheless, the definitional limitation of community home to six or fewer retarded individuals and two live-in counselors together with the requirement of R.S. 28:478(B) that a community home shall not be placed within a 1000 foot radius of another community home should insure that undue concentrations of population are not created by the location of a community home. And, the state Legislature has recognized that "mental retardation/development disability does not in and of itself pose a threat to the safety and security of a community or the individual...." La.Rev.Stat.Ann. § 28:393(A). We can find no valid objective to this requirement of local approval. We discern no substantial relationship between the restriction on the establishment of group homes for the mentally retarded and any important governmental objective. Since this section cannot withstand scrutiny under the equal protection analysis, we conclude that it is constitutionally infirm.
For the foregoing reasons we find that R.S. 28:478(C) insofar as it denies relators the right to use the Manuels' property for a community home without prior approval of the governing authority of Scott, Louisiana, violates the equal protection clause of the United States and Louisiana Constitutions, and is thus without force and effect.

Decree
The judgment of the district court granting respondents a preliminary injunction, and the judgment of the Court of Appeal affirming, are reversed and set aside. The petition of plaintiffs is dismissed with prejudice.
PLAINTIFFS' PETITION DISMISSED WITH PREJUDICE.
MARCUS, J., concurs and assigns reasons.
DENNIS, J., concurs with reasons.
MARCUS, Justice (concurring)
I concur with the majority that the proposed use of the land is not in violation of the subdivision's restrictive covenants which should be strictly construed. The only restriction on use is that the lots be used exclusively for residential purposes.
I further concur with the majority that La.R.S. 28:478(C) is unconstitutional as applied. *1287 in this case. The land at issue is unzoned. No other person is required to obtain the approval of the local governing authority before using the land. There is no legitimate state interest for singling out mentally and physically handicapped persons and requiring them to obtain approval.
NOTES
[1] Under the authority of La.Rev.Stat.Ann. § 24:253.1, the definition of "community home," R.S. 28:381(5) was redesignated R.S. 28:381(8) by the Louisiana Law Institute, upon their incorporating the subsection in the Louisiana Revised Statutes of 1950 as amended.
[2] Munson v. Berdon, 51 So.2d 157 (La.App. 1st Cir.1951). The Munson court further concluded that "all doubts [are to be] resolved in favor of free use of property and against restrictions."
[3] As in City of W. Monroe v. Ouachita Ass'n for Retarded Chn., 402 So.2d 259 (La.App.2d Cir. 1981), the entrances, living room, dining room, kitchen, laundry and other aspects of the house will be for common usage. Such an arrangement contrasts with a boarding house, for instance, where certain rooms may be cordoned off or separated, for entirely private and independent occupant use.
[4] In fact, the listing of rights in La.Rev.Stat.Ann. 28:390(B) adheres closely to the language of the Gary W. decision.
[5] La.Rev.Stat.Ann. § 28:476 specifically states that "the provisions of this Chapter are an exercise of the police power reserved to the state by Article I, Section 4 and Article VI, Section 9(B) of the Constitution of Louisiana."
[6] We do not in this opinion determine that a local zoning ordinance must fall in the face of state legislative policy that encourages the establishment of community homes.
[7] Section B directs that no community home shall be placed within a one thousand foot radius of another community home and that DHHR "shall establish appropriate standards with interpretative guidelines and establish monitoring procedures."
[8] There is no suggestion in this record that the property at issue is in a zoning district. This case involves only purported violations of a restrictive covenant applicable to lots within the Westgate Subdivision of Scott, Louisiana.
[9] In the City of West Monroe, the Second Circuit held that a group home, composed of six mentally retarded adults and two houseparents, was a one family dwelling under the zoning ordinance of the City of West Monroe there under consideration.
[10] Establishing a "community home" is not only a legal endeavor, but one which is in keeping with the policy and laudatory aims of the state as embodied in its legislative acts. In La.Rev. Stat.Ann. § 28:390(B)(1), the Legislature granted to every mentally retarded individual the right "to live in the least restrictive residential living option appropriate to his individual needs and abilities," which specifically includes community homes. This policy was reiterated in R.S. 28:476, within Chapter 5, as follows:

it is the policy of this state as declared and established in this Title and in the mental retardation law and in the mental health law that mentally and physically handicapped persons are entitled to live in the least restrictive environment in their own community and in normal residential surroundings and should not be excluded therefrom because of their disabilities.
And, R.S. 28:478, entitled "Promotion of community based homes," establishes a statewide policy of permitting community homes by right in certain zoned districts. Thus, it cannot be denied that the creation of community based homes for use by its mentally retarded citizens is, besides being legal, favored by the state of Louisiana.
[11] United States v. Carolene Product Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938).
[12] On July 6, 1984, both a rehearing and a rehearing en banc were denied by the Fifth Circuit. 735 F.2d 832 (5th Cir.1984). The United States Supreme Court has, however, agreed to take the case up. ___ U.S. ___, 105 S.Ct. 457, 83 L.Ed.2d 354 (1985).
[13] Although euthanasia was rejected, thirty-two states have had statutes providing for the sterilization of retarded individuals. Cleburne Living Center v. City of Cleburne, Texas, 726 F.2d 191, 197 (5th Cir.1984) (citing Penn. Assoc. of Retarded Chn. v. Penn., 343 F.Supp. 279, 294 (E.D.Pa. 1972)).
[14] Note the Louisiana Legislature's strong public policy expression at R.S. 28:476. When the Legislature declared it was the public policy of the State of Louisiana that mentally handicapped persons are entitled to live in the least restrictive environment "in their own community and in normal residential surroundings," they further asserted that those provisions are intended to secure to all citizens the right to individual dignity as provided in Art. 1, Section 3 of the 1974 Constitution.
[15] See Gary W. v. State of La., 437 F.Supp. 1209, 1215 (E.D.La.1976).
[16] Plaintiff's brief points out that according to La.Rev.Stat. 28:478(A) the state's objective in implementing the mental retardation and mental health law is to achieve statewide uniformity. Such an objective does not seem likely to be achieved by permitting local governing bodies to make the ultimate decision as to whether or not a community home can be located at a particular site.